# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMES G. KAVANAUGH,<br><br>    Plaintiff,<br><br>v.<br><br>ANDREW SAUL, Commissioner of Social Security,<br><br>    Defendant. | No. 3:18-cv-01521 (MPS) |

## RULING ON THE PLAINTIFF'S MOTION TO REVERSE AND/OR REMAND AND THE DEFENDANT'S MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER

Plaintiff James G. Kavanaugh brings this action against the Commissioner of Social Security under 42 U.S.C. § 405(g), challenging the denial of his application for Title II disability insurance benefits ("DIB"). The Administrative Law Judge ("ALJ") determined that the plaintiff was not disabled within the meaning of the Social Security Act ("the Act") from September 1, 1999, his alleged onset date, through December 31, 2004, his date last insured. ECF No. 27 at 2. Mr. Kavanaugh argues that the ALJ's determination (1) was not supported by substantial evidence, (2) improperly assessed the medical opinion evidence, and (3) improperly considered Mr. Kavanaugh's substance abuse. ECF No. 30. The Commissioner moves for an order affirming the denial of benefits. ECF No. 27. For the reasons set forth below, I grant the Commissioner's motion and affirm the ALJ's decision.

I assume familiarity with Mr. Kavanaugh's medical history, as described in Mr. Kavanaugh's filings, ECF Nos. 26, 30, and summarized in the Commissioner's statement of material facts, ECF No. 27-1, both of which I adopt and incorporate herein by reference. I also assume familiarity with the ALJ's opinion, the record, and the five sequential steps used in the

analysis of disability claims. I cite only those portions of the record and the legal standards necessary to explain this ruling.

I. **BACKGROUND**

A brief summary of the procedural history of this case is necessary. Mr. Kavanaugh applied to the Social Security Administration for disability benefits on December 3, 2007, alleging disability beginning September 1, 1999. Record ("R.") 438. He met the insured status requirements of the Act through December 31, 2004, his "date last insured." R. 13. Accordingly, to receive disability benefits, Mr. Kavanaugh must establish that he had a disability within the meaning of the Act on or before December 31, 2004.[1]

Mr. Kavanaugh's 2007 claim for benefits was denied, he had a hearing, and an unfavorable decision was issued by ALJ Robert DiBiccaro on February 22, 2011. *Id.*; *see* R. 12. After Mr. Kavanaugh filed an action in this Court, No. 3:11-cv-1210, the case was remanded by stipulation of the parties. R. 438. ALJ DiBiccaro issued a second unfavorable decision on August 26, 2013. *Id.*; *see* R. 675. Mr. Kavanaugh appealed that decision to the Appeals Council, which

---

[1] "To be eligible for disability insurance benefits, an applicant must be 'insured for disability insurance benefits.'" *Arnone v. Bowen*, 882 F.2d 34, 37 (2d Cir. 1989) (quoting 42 U.S.C. § 423(a)(1)(A), (c)(1) and citing 20 C.F.R. § 404.130, .315(a) (1988)). Specifically, "the claimant must demonstrate that [he] was disabled on the date [he] was last insured for benefits." *Swainbank v. Astrue*, 356 F. App'x 545, 547 (2d Cir. 2009) (citation omitted). "Where, as here, a claimant does not apply for benefits before his date last insured, he may still obtain benefits if [he] has been under a continuous period of disability that began when [he] was eligible to receive benefits." *Perrone v. Saul*, No. 3:17-CV-125(RNC), 2019 WL 4744820, at *1 n.2 (D. Conn. Sept. 30, 2019) (alterations in original). "Nonetheless, no matter how disabled a claimant is at the time of his application or hearing, he is only entitled to the benefits of the Act if he is able to prove disability existed prior to his date last insured." *Id.* "[W]hen a claimant does not show that a currently existing condition rendered [him] disabled prior to [his] date last insured, benefits must be denied." *Mauro v. Berryhill*, 270 F. Supp. 3d 754, 762 (S.D.N.Y. 2017) (collecting cases); *see Monette v. Astrue*, 269 F. App'x 109, 111 (2d Cir. 2008) ("[The claimant] would be eligible to receive disability insurance benefits if, but only if, he can demonstrate disability ... before [his date last insured].").

remanded the case. R. 438. Upon remand, ALJ Matthew Kuperstein issued another unfavorable decision, which Mr. Kavanaugh challenges in this action.

## II. STANDARD OF REVIEW

"A district court reviewing a final . . . decision pursuant to . . . 42 U.S.C. § 405(g), is performing an appellate function." *Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Accordingly, a district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Court's function is to ascertain whether the correct legal principles were applied in reaching the decision, and whether the decision is supported by substantial evidence. *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987). If the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982). The Second Circuit has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (citation and quotation marks omitted). Substantial evidence must be "more than a mere scintilla or a touch of proof here and there in the record." *Id.*

## III. DISCUSSION

As discussed above, to receive disability benefits, Mr. Kavanaugh bears the burden of establishing that he had a disability within the meaning of the Act on or before December 31, 2004. He argues that he suffered from two severe impairments, other than substance abuse, prior to that date: polyneuropathy and bipolar disorder.

A. **Polyneuropathy**

Mr. Kavanaugh argues that the ALJ's determination that polyneuropathy was not a severe impairment was not supported by substantial evidence. ECF No. 30 at 1. And while Mr. Kavanaugh does not explicitly cite the treating physician rule, he argues in substance that the ALJ ignored the medical opinion of Dr. G. Gary Lian, who treated Mr. Kavanaugh from at least 2010–2013 and opined that Mr. Kavanaugh's polyneuropathy symptoms existed "since at least 12/31/04." R. 984; ECF No. 26 at 1; ECF No. 30 at 2. I find, however, that the ALJ gave good reasons for dismissing Dr. Lian's retrospective opinion, and that Mr. Kavanaugh has not otherwise met his burden to show a severe impairment during the relevant period.

   1. *Dr. Lian's June 2013 Opinion*

Mr. Kavanaugh points to a Medical Source Summary completed by Dr. Lian on June 18, 2013, which diagnosed "severe . . . polyneuropathy" and opined that Mr. Kavanaugh was restricted in his ability to sit, stand, and walk, would be off task more than 20% of an 8-hour workday, and would be absent more than four days per month. R. 980–82. Dr. Lian also opined in June 2013 that Mr. Kavanaugh's limitations "existed and persisted to the same degree since at least 12/31/04," explaining that "[t]he p[atien]t probably has same$^2$ severe polyneuropathy based on his previous medical record." R. 984. Treatment notes from Dr. Lian between May 2010 and June 2013 all indicate "severe axonal sensorimotor polyneuropathy." R. 961–73.

The ALJ considered Dr. Lian's June 2013 Opinion, but appeared to give it little or no weight, since Dr. Lian "did not treat the claimant prior to the date last insured and . . . any previous medical records he was referring to were out of the scope of the period at issue." R.

---

$^2$ Dr. Lian's handwriting is unclear, so it is difficult to determine whether the note says Mr. Kavanaugh has "same severe polyneuropathy" or "some severe polyneuropathy." R. 984. My analysis is the same regardless.

4

449. I agree with the Commissioner that the ALJ properly found that Mr. Kavanaugh did not meet his burden to establish a severe impairment of polyneuropathy during the relevant period. To the extent Mr. Kavanaugh argues that the ALJ violated the treating physician rule in his assessment of Dr. Lian's opinion, I find that, although the ALJ should have been more explicit in his assignment of weight and should have explicitly considered each of the relevant factors, the ALJ gave good reasons to support his decision to assign little or no weight. I also find that his decision was supported by substantial evidence, and that, as discussed below in Section III.C, any error was harmless.

Social Security regulations require the claimant to show that he has an "impairment or combination of impairments which significantly limits . . . the abilities and aptitudes necessary to do most jobs." *Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (citing 20 C.F.R. §§ 404.1520(c), 404.1521(b)). Therefore, the burden is on the claimant, at step two of the five-step process, to show a "medically severe impairment or combination of impairments." *Bowen*, 482 U.S. at 146 n.5. A claimant may offer retrospective diagnoses as evidence of a disability during the relevant period, and such a diagnosis from a treating physician "is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." *Reynolds v. Colvin*, 570 F. App'x 45, 48 (2d Cir. 2014); *see also Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) ("A treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques."). However, the Second Circuit has approved according little weight to a treating physician's retrospective diagnosis where the doctor did not treat the claimant during the relevant period and where "record medical evidence contradicted or failed to support [the doctor's] retrospective opinions." *Reynolds*, 570 F. App'x at 48.

Here, to begin with, the ALJ properly gave less-than-controlling weight to Dr. Lian's retrospective opinion, because it was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and was "inconsistent with the other substantial evidence in the case record." *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). Dr. Lian began treating Mr. Kavanaugh in 2010 and so did not become a treating physician until 6 years after the relevant period. R. 581. Further, as the Commissioner argues, Dr. Lian's retrospective opinion is "vague and equivocal," ECF No. 27 at 5, stating without citing any specific evidence and without elaboration that Mr. Kavanaugh "*probably* has same severe polyneuropathy based on his previous medical record." R. 984 (emphasis supplied). Dr. Lian does not cite this "previous medical record," and Mr. Kavanaugh has not submitted it. There is thus nothing in the record suggesting that Dr. Lian's 2013 opinion was "well-supported." Mr. Kavanaugh's attorney represented at the June 7, 2016 hearing before the ALJ that she tried to obtain the records but was told "that they were not available." R. 581.[3] Mr. Kavanaugh stated at the hearing that he "believe[d]" the previous records Dr. Lian reviewed were records from Dr. Sinclair, a

---

[3] The Court notes that "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009) (internal quotation marks and citation omitted). Mr. Kavanaugh has not argued that the ALJ failed to develop the record, but I find that such an argument would be without merit here. Even though Mr. Kavanaugh lacks medical evidence from his relevant period, the transcript of the June 2016 administrative hearing shows that the ALJ and Mr. Kavanaugh's former counsel made concerted attempts to develop the record as best they could. *See* R. 580–81 (ALJ noted that he "sent a letter to [Mr. Kavanaugh's attorney's] office to get further records from Dr. L[ia]n . . . and I didn't receive any."); R. 581–82 (Mr. Kavanaugh's attorney explained, "We asked for a lot of evidence, and we just haven't had any luck. We attempted to get records from other providers from Connecticut Medical Group . . . . They said that everything's been destroyed . . . . So the only thing we were able to obtain were the current medical records . . . ."); R. 584–86 (ALJ noting he would leave the record open for two weeks after the hearing, in case records from the relevant period were located). The transcript shows that the ALJ met his duty to develop the record by "scrupulously and conscientiously probing into, inquiring of, and exploring for all the relevant facts." *Moran*, 569 F.3d at 113.

neurologist Mr. Kavanaugh began seeing in 2009—some five years after the relevant period. R. 581; *see also* R. 973 (May 18, 2010 note by Dr. Lian after Mr. Kavanaugh's first visit, stating that he is awaiting receipt of "previous medical record" from Dr. Sinclair). The ALJ was thus correct in noting that "any previous medical records [Dr. Lian] was referring to were out of the scope of the period at issue." R. 449.

Mr. Kavanaugh has offered only one contemporaneous medical record from the relevant period, which makes no mention of polyneuropathy. R. 955–960 (May 27, 2004 discharge summary from Connecticut Mental Health Center ("CMHC"))[4]; R. 958 (noting "no significant abnormalities on the physical examination, other than the cataract surgery"); R. 581–82 (Mr. Kavanaugh's attorney represented at the hearing that he was unable to obtain any other records from the relevant period, other than the CMHC record). Because Dr. Lian's opinion concerning the relevant period was vague and unsupported by any medical records from that period, and because the only contemporaneous medical record contradicts Dr. Lian's opinion that Mr. Kavanaugh's polyneuropathy "probably" existed prior to December 31, 2004, the ALJ properly assigned Dr. Lian's opinion less-than-controlling weight.

Under the treating physician rule, "if the ALJ decides the opinion is not entitled to controlling weight, [he] must determine how much weight, if any, to give it." *Estrella v.*

---

[4] Mr. Kavanaugh argues that this discharge summary "gives the incorrect impression that [his] medical conditions are due to alcohol abuse without informing the reader of an inherent bias to qualify a patient for the volunteer studies . . . by under[-]diagnosing impairments." ECF No. 26 at 1; ECF No. 30 at 5 (explaining that the study "depended upon a diagnosis [of alcohol abuse] without any other medical conditions to qualify," so he "initially den[ied] any history of depression, manic symptoms, or anxiety during admission, due to a fear of not qualifying for the [study]"). Even if Mr. Kavanaugh did under-report his symptoms, he offers no other medical evidence to suggest that he suffered from polyneuropathy prior to May 2004 or that any psychiatric conditions were "severe impairments" at the time. The CMHC also conducted a physical exam that showed "no significant abnormalities," and a mental status exam on which he scored "29 out of 30." R. 958–59.

*Berryhill*, 925 F.3d 90, 95 (2d Cir. 2019). In doing so, "[the ALJ] must explicitly consider the following, non-exclusive '*Burgess* factors': '(1) the frequen[cy], length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist.'" *Id.* at 95-96 (citations omitted). An ALJ's failure to apply the *Burgess* factors "explicitly" is a "procedural error." *Id.* But such a procedural error does not necessarily warrant a remand. "To put it simply, a reviewing Court should remand for failure to explicitly consider the *Burgess* factors unless a searching review of the record shows that the ALJ has provided 'good reasons' for its weight assessment." *Guerra v. Saul*, 778 F. App'x 75, 77 (2d Cir. 2019).

The ALJ did not explicitly consider two of the four *Burgess* factors in his discussion of Dr. Lian's 2013 opinion, mentioning only that Dr. Lian was a neurologist and the lack of medical evidence from the relevant period supporting his opinion. R. 449. However, the record as a whole nonetheless shows that the ALJ provided "good reasons" for according Dr. Lian's 2013 opinion little or no weight. The ALJ wrote that Dr. Lian "was not treating the claimant at the time of the date last insured, but indicated that his opinion was based on previous medical records." *Id.* He then stated that, "[a]t the hearing, counsel confirmed that . . . any previous medical records [Dr. Lian] was referring to were out of the scope of the period at issue," *id.*, which, as shown above, is correct. *See* R. 581 (Mr. Kavanaugh testified that he "believe[d]" the records Dr. Lian reviewed were those of Dr. Sinclair, who began treating him in 2009). The ALJ had good reason, therefore, to accord no weight to Dr. Lian's 2013 opinion, since it was not based on treatment during the relevant period and erroneously suggested that it was based on records from the relevant period. Even if the ALJ committed procedural error in failing to

8

consider all of the *Burgess* factors explicitly, he provided good reasons for dismissing Dr. Lian's 2013 opinion and thus did not violate the treating physician rule.

### 2. *Madelyn Kavanaugh's Testimony*

Mr. Kavanaugh also argued that the ALJ failed to consider the "testimony" of his mother, Madelyn Kavanaugh, that his polyneuropathy began in October 2004. ECF No. 26 at 1; ECF No. 30 at 2. This argument lacks merit because Ms. Kavanaugh did not testify, and the ALJ did, in fact, explicitly consider her sworn June 28, 2016 statement. R. 450 ("The undersigned has also considered the statement of the claimant's mother, Madelyn Kavanaugh (Exhibit 39E)."). Ms. Kavanaugh's statement refers to a car accident "in 2004" and states that she has "been [Mr. Kavanaugh's] primary source of transportation" since then. R. 942. But the statement does not discuss the cause of the accident nor mention any polyneuropathy or other physical impairments existing in 2004 or before. *Id.* Ms. Kavanaugh did not testify at any of the four administrative hearings in this matter, ECF No. 27 at 5 n.2, and Mr. Kavanaugh does not point to any other "testimony" offered by his mother. Ms. Kavanaugh's "testimony," therefore does not suggest that the ALJ erred in determining that Mr. Kavanaugh did not have any severe impairments during the relevant period other than alcohol use disorder.

## B. **Bipolar Disorder**

Mr. Kavanaugh also argues that he has suffered from bipolar disorder since before December 31, 2004 and that the ALJ "did not properly weigh the medical opinion evidence" on this point. ECF No. 30 at 3; ECF No. 26 at 2. Specifically, he "contend[s] the ALJ accorded too much weight to the opinion of Dr. Efobi [a medical expert], and too little weight to the opinions of Drs. Schnitt, Wyatt and Grillo," who treated Mr. Kavanaugh. ECF No. 30 at 3. For the

9

reasons discussed below, I do not find that the ALJ violated the treating physician rule or otherwise erred with respect to any of the medical opinions offered.

### 1. *Dr. Schnitt's October 2008 Opinion*

Dr. Jerome Schnitt, a psychiatrist and Medical Director at the Stonington Institute, first treated Mr. Kavanaugh in 1997 and saw him "a total of 5 times [from 9/26/97 through 12/30/97] for a bipolar disorder [DSM-IV 296.89]" before Mr. Kavanaugh "left treatment voluntarily." R. 374 (July 26, 2010 letter from Dr. Schnitt, providing "documentation of your treatment . . . [a]ccording to our computer records")[5]. From September 23, 2008 to November 21, 2008, Mr. Kavanaugh was "in treatment [at the Stonington Institute] for the purpose of addressing his alcohol dependency and for treatment for his Bipolar Disorder." R. 353. On October 28, 2008, Dr. Schnitt completed a Medical Source Statement regarding Mr. Kavanaugh's affective disorders, based on "observation in current program" at the Stonington Institute. R. 345–47. In that October 2008 statement, Dr. Schnitt indicated that Mr. Kavanaugh suffered from "bipolar syndrome" that caused marked restrictions and difficulties in his functional capacity and was "independent of substance abuse." *Id.* He opined, "within a reasonable degree of medical or psychological probability as to past limitations," that the limitations he observed were first present in 1998. R. 348.[6] Mr. Kavanaugh argues that the ALJ "accorded . . . too little weight" to Dr. Schnitt's opinion. ECF No. 30 at 3.

---

[5] Dr. Schnitt's letter states that "clinical records are kept for 7 years following the last visit and then shredded," so the "computer records" were the only remaining records related to Mr. Kavanaugh. R. 374.

[6] In response to the same question on the form, Dr. Schnitt also wrote "YPI 1994," perhaps referring to Yale Psychiatric Institute. R. 348. Mr. Kavanaugh told the CMHC in May 2004 that he was "treated in New Haven as an outpatient approximately five years ago for questionable bipolar disorder. He was on Lithium, Wellbutrin, and Paxil at that time; which he self-discontinued and has had no treatment since then. The duration of treatment was approximately two years." R. 956. Together, this evidence suggests that Mr. Kavanaugh was treated as an

10

As noted above, a treating physician's medical opinion, including a retrospective opinion, "is entitled to controlling weight unless it is contradicted by other medical evidence or overwhelmingly compelling non-medical evidence." *Reynolds*, 570 F. App'x at 48. If the ALJ decides the opinion is not entitled to controlling weight, he must explicitly consider the *Burgess* factors. *Estrella*, 925 F.3d at 95–96. If an ALJ commits the procedural error of failing to apply the *Burgess* factors explicitly, the Court should remand unless the ALJ has otherwise provided good reasons for his weight assessment. *Guerra*, 778 F. App'x at 77.

The ALJ considered Dr. Schnitt's October 2008 opinion but gave it "no weight." R. 446. The ALJ does explicitly consider the first *Burgess* factor regarding the frequency and length of treatment, noting that Dr. Schnitt had a "brief" treatment relationship with Mr. Kavanaugh from September to December 1997, before the relevant period, and then did not treat him again until 2008, after the relevant period. R. 446. The ALJ also considered the "amount of medical evidence supporting the opinion," remarking that Dr. Schnitt's October 2008 opinion is a "check-off form," in which Dr. Schnitt indicated that Mr. Kavanaugh suffered from a number of depressive and manic symptoms but did not provide dates for the symptoms or mention a particular examination. *Id.*; *see* R. 345–49. Rather, Dr. Schnitt says only that his opinion is based on "observation in current program." R. 446 (citing R. 347). The ALJ reasoned that Mr. Kavanaugh's treatment at the Stonington Institute was "almost four years after the date last insured," so observation during that program "provides no probative value for the claimant's status in 2004." R. 446.

---

outpatient at the Yale Psychiatric Institute sometime between 1994 and 1998. Mr. Kavanaugh has not submitted any records of such treatment.

While the ALJ did not explicitly consider the remaining two *Burgess* factors, he nevertheless provided "good reasons" for assigning Dr. Schnitt's opinion no weight. While there is some evidence to suggest that Mr. Kavanaugh was treated for bipolar disorder at some point in the 1994-1998 period, *see* R. 956; R. 348, there is no evidence in the record to support a conclusion that the bipolar disorder constituted a severe impairment during the relevant 1999-2004 period. Dr. Schnitt does not opine on the severity of Mr. Kavanaugh's symptoms from 1999–2004, and Mr. Kavanaugh told the CMHC in May 2004 that he "has had no treatment" since "approximately five years ago." R. 956. Further, at CHMC, Mr. Kavanaugh denied any "history of depression or manic symptoms" and denied any anxiety, R. 956, and he was "oriented to person, place, and time" and "scored 29 out of 30 on the mini mental status examination," R. 959. Because the ALJ provided good reasons for assigning Dr. Schnitt's opinion no weight, he did not violate the treating physician rule.

### 2. *Dr. Wyatt's July 2010 and June 2013 Opinions*

Dr. Stephen Wyatt, a psychiatrist at Middlesex Hospital, first treated Mr. Kavanaugh in February 2009, five years after the relevant period ended. R. 371; R. 979. In a July 15, 2010 letter, Dr. Wyatt states that Mr. Kavanaugh "related a history of having been treated for a bipolar mood disorder for many years." R. 371. In a June 24, 2013 Medical Source Statement, Dr. Wyatt also opined that Mr. Kavanaugh's "limitations of function . . . existed and persisted to the same degree since at least 12/31/04," explaining that "in reviewing [Mr. Kavanaugh's] history, it is clear these problems started prior to my engagement with him." R. 979. Mr. Kavanaugh argues that the ALJ "accorded . . . too little weight" to Dr. Wyatt's opinions. ECF No. 30 at 3.

The ALJ considered both Dr. Wyatt's July 2010 letter and his June 2013 opinion. R. 449. He gave the July 2010 letter "no weight" because Dr. Wyatt "was not treating the claimant at the

time of the date last insured." *Id.* The July 2010 letter does not offer any retrospective diagnosis of bipolar disorder, so it is not probative of whether Mr. Kavanaugh suffered from bipolar disorder during the relevant period. R. 371. The ALJ gave the June 2013 opinion, including its assertion that Mr. Kavanaugh's bipolar disorder existed since at least 2004, "limited weight" since Dr. Wyatt "was not treating the claimant at that time" and "his opinion is not supported by any treatment notes." R. 449.

The ALJ had substantial evidence to support his decision not to give Dr. Wyatt's June 2013 retrospective diagnosis controlling weight, and he provided good reasons for his weight assessment, even if he failed to explicitly consider all four of the *Burgess* factors. Dr. Wyatt's only knowledge of the relevant period is based on "reviewing [Mr. Kavanaugh's] history." R. 979. But neither Dr. Wyatt nor Mr. Kavanaugh explains what "history" Dr. Wyatt reviewed, and the record does not contain any treatment notes from the relevant period other than the CMHC discharge summary, which, as noted, supports the ALJ's findings here. Moreover, Dr. Wyatt contends only that Mr. Kavanaugh's "limitations of function" have existed "since at least 12/31/04;" he does not offer an opinion on exactly when the limitations began or what their cause was (including, for example, whether alcohol was a contributing factor during the relevant period). In his July 2010 letter, Dr. Wyatt suggested that Mr. Kavanaugh's neurological, mood, and memory problems were all caused or at least worsened by his "prolonged and profound use of alcohol." R. 371. Nothing in Dr. Wyatt's opinions, therefore, undermines the ALJ's conclusion that Mr. Kavanaugh did not have any severe impairments during the relevant period in the absence of alcohol abuse. R. 450. Because Dr. Wyatt's June 2013 retrospective diagnosis was "not supported by any treatment notes" or other medical evidence, the ALJ had good reasons to accord it limited weight and therefore did not violate the treating physician rule.

### 3. *Dr. Grillo's June 2016 Opinion*

Dr. Robert Grillo, a doctor at Middlesex Hospital's Center for Behavioral Health, similarly began treating Mr. Kavanaugh in February 2009. R. 1161. In a June 15, 2016 letter, Dr. Grillo wrote that Mr. Kavanaugh has been treated for "bipolar illness," among other conditions, since 2009 and that he has been "unable to work" since that time. *Id.* Dr. Grillo also opines on the origins of Mr. Kavanaugh's bipolar disorder:

> We cannot definitively state when his inability to work began. . . . It is our belief that his alcohol dependence was not solely the cause of his disability; we believe that alcohol exacerbated his mood disorder, which was already spinning out of control. It is our experience . . . that many patients with bipolar illness "self-medicate" with alcohol and other drugs . . . .

*Id.* Mr. Kavanaugh argues that the ALJ gave this opinion "too little weight" and "quoted [it] out of context." ECF No. 30 at 3, 6.

The ALJ considered Dr. Grillo's June 2016 opinion and gave it "little weight." R. 449. He notes that Dr. Grillo "could not definitively state when the claimant's inability to work began." *Id.* And though Dr. Grillo believed that "alcohol dependence was not solely the cause of his disability," he "stated that alcohol exacerbated the claimant's mood disorder." *Id.* The ALJ also noted that "the record fails to reflect that the claimant had symptoms of bipolar [disorder] during the period at issue, as this is not reflected in any of the medical records from the period prior to the date last insured or shortly thereafter." R. 449–50. In this analysis, though he did not explicitly consider all the *Burgess* factors, the ALJ set forth good reasons for according Dr. Grillo's opinion little weight, since the opinion is not probative of whether Mr. Kavanaugh suffered from a severe impairment during the relevant period. Dr. Grillo did not treat Mr. Kavanaugh during the relevant period, does not indicate that he reviewed any medical records from the relevant period, and does not even offer an opinion regarding the onset of Mr.

14

Kavanaugh's bipolar disorder or specific functional limitations resulting from that disorder, other than an "inability to work," which is an issue reserved for the Commissioner. *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("[S]ome kinds of findings—including the ultimate finding of whether a claimant is disabled and cannot work—are reserved to the Commissioner." (internal quotation marks omitted)).

Dr. Grillo's opinion that "alcohol dependence was not solely the cause of Mr. Kavanaugh's disability," R. 1161, also would not affect the ALJ's analysis of Mr. Kavanaugh's disability status. Under 42 U.S.C. § 423(d)(2)C), "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled." *See also Sarner v. Astrue*, No. 08-CV-3281, 2012 WL 1888133, at *2 (E.D.N.Y. May 22, 2012) ("In determining whether alcohol or substance abuse is material to the determination of disability, the key factor is whether the Commissioner would still find the claimant disabled if she stopped using the alcohol or substance."). Dr. Grillo's opinion that alcohol use was not the *sole* cause of Mr. Kavanaugh's bipolar disorder is therefore not probative; rather, his statement that "alcohol exacerbated his mood disorder," R. 1161, suggests that alcohol abuse was, in fact, a "contributing factor material to [Mr. Kavanaugh's functional limitations]." 42 U.S.C. § 423(d)(2)(C). In any event, as noted, Dr. Grillo's opinion about the causative role of alcohol dependence in Mr. Kavanaugh's limitations is not based on any treatment or any records of treatment during the relevant period. Because Dr. Grillo's June 2016 opinion is either unsupported by medical evidence or irrelevant to the ALJ's analysis under the Social Security Act, the ALJ had good reasons for according the opinion limited weight and did not violate the treating physician rule.

15

### *4. Dr. Efobi's June 2016 Opinion*

Mr. Kavanaugh also argues that the "ALJ accorded too much weight to the opinion of Dr. Efobi," who testified as a medical expert at Mr. Kavanaugh's June 2016 administrative hearing. ECF No. 30 at 3. As stated above, I found that substantial evidence supported the ALJ's decision to give little or no weight to the opinions of Drs. Schnitt, Wyatt, and Grillo. For many of the same reasons, the ALJ did not err in according "great weight" to Dr. Efobi's opinion that "the only medically determinable impairment documented prior to the date last insured was a substance abuse disorder." R. 445. This decision is supported by substantial evidence; as discussed above, Mr. Kavanaugh did not offer any medical evidence from the relevant period aside from the CMHC discharge summary, which does not document any impairments other than alcohol abuse.

Mr. Kavanaugh argues that "Dr. Efobi neglects to consider that I was sober for significant periods of abstinence in the period between 1999 and 2004 yet could not work as evidenced by my social security employment record." ECF No. 30 at 7. In evaluating Dr. Efobi's opinion, the ALJ noted that Dr. Efobi's opinion was based on a "review[ of] the entire medical file," rather than on any treatment of Mr. Kavanaugh, but concluded that the opinion was "consistent with the records, showing no other impairments prior to the date last insured," and noted that Dr. Efobi, a board certified psychiatrist, was a specialist. R. 445. These are good reasons for according weight to Dr. Efobi's opinion. Further, even if Mr. Kavanaugh was sober for "significant periods" from 1999–2004, he still has failed to meet his burden of showing a severe impairment, independent of substance abuse, during that period. Dr. Efobi testified, on the basis of the CMHC record, that "the illness that is shown by the record [during the relevant period] . . . is mostly alcohol use disorder" and that "the only listing that has some support would be 12.09,

16

alcohol use disorder, for that period." R. 590–91. The record supports this opinion, since Mr. Kavanaugh has not offered any medical evidence of other severe impairments during the relevant period. The ALJ did not err in giving Dr. Efobi's testimony great weight.

C. **Harmless Error**

Even if the ALJ did violate the treating physician rule with respect to Drs. Lian, Schnitt, Wyatt, or Grillo, I would find such error to be harmless. The record contains no evidence that Mr. Kavanaugh suffered from a severe impairment, other than alcohol abuse, during the relevant period, and it is Mr. Kavanaugh's burden to make such a showing. I recognize that the standard for a severe impairment is not demanding and may be applied "solely to screen out *de minimis* claims." *Dixon v. Shalala*, 54 F.3d 1019, 1030 (2d Cir. 1995). For the reasons discussed above, however, there is substantial evidence to support the ALJ's conclusion that even this low bar was not cleared in this case. Therefore, even if I were to remand the case to the ALJ for a more fulsome discussion of the treating physicians' opinions, there is nothing in the record to suggest any "reasonable likelihood" that full compliance with the treating physician rule would have changed the ALJ's disability determination. *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010). Remand is therefore not required.

D. **Substance Abuse**

Finally, Mr. Kavanaugh argues that the ALJ did not "consider properly" his substance abuse, claiming that his "alcoholism is not a contributing factor material to the determination of disability." ECF No. 30 at 3. For the same reasons discussed above, substantial evidence supports the ALJ's finding that Mr. Kavanaugh did not have any severe impairments, independent of alcohol abuse, during the relevant period. The record clearly shows that, in the past ten years, Mr. Kavanaugh has suffered from a number of impairments and medical

17

challenges even after he stopped drinking. Unfortunately, to be eligible for disability benefits under the Social Security Act, Mr. Kavanaugh was required to show that he suffered from a severe impairment, independent of alcohol use, between September 1999 and December 2004. *See Perrone v. Saul*, No. 3:17-CV-125(RNC), 2019 WL 4744820, at *1 n.2 (D. Conn. Sept. 30, 2019) ("Nonetheless, no matter how disabled a claimant is at the time of his application or hearing, he is only entitled to the benefits of the Act if he is able to prove disability existed prior to his date last insured."). Mr. Kavanaugh has not met that burden.

## IV. CONCLUSION

For the reasons set forth above, the plaintiff's motion to reverse the decision of the Commissioner, ECF No. 26, is DENIED, and the defendant's motion to affirm, ECF No. 27, is GRANTED. The Clerk is directed to enter judgment for the Commissioner and to close this case.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated: Hartford, Connecticut
March 12, 2020